# IN THE COURT OF APPEALS OF IOWA

No. 22-1756
Filed January 11, 2023

**IN THE INTEREST OF F.M.,**
   **Minor Child,**

**T.Z., Mother,**
   Appellant.

_____

Appeal from the Iowa District Court for Mitchell County, Karen Kaufman Salic, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Elizabeth A. Batey of Vickers Law Office (until withdrawal), Greene, and Ann Troge, Charles City, for appellant mother.

Brenna Bird, Attorney General, and Ellen Ramsey-Kacena (until withdrawal) and Natalie Hedberg, Assistant Attorneys General, for appellee State.

Mark A. Milder of Mark Milder Law Firm, Denver, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

A mother whose daughter, born in 2015, was the subject of eight unfounded reports of sexual abuse appeals the termination of her parental rights under Iowa Code section 232.116(1)(f) (2022). We reject her challenges to each of the three steps in our termination framework and affirm.

## I.  Background Facts and Proceedings

Beginning when this child was just three years old, the Iowa Department of Health and Human Services started receiving reports that she was being sexually abused by the men in her family—her father, brothers, cousin, and grandfather. These reports continued for the next year and a half, subjecting the child to multiple interviews and physical examinations. All were unfounded. But because the allegations continued to be made, the State petitioned to have her adjudicated as a child in need of assistance.

When the petition was filed in October 2019, the child was living with the mother and her older sister[1] and having visits with her father. The parents stipulated to the child's adjudication and both were ordered to obtain psychological evaluations. No concerns were noted in the father's evaluation. The same was not true for the mother. Her evaluation uncovered "a number of significant concerns in regard to her care of her two daughters," including an inadequate understanding of child development, unrealistic expectations of children, limited empathy, and "the belief that the children are there to meet her needs (thus prioritizing her own welfare over theirs)." To address these concerns, the

---

[1] This child was not adjudicated as a child in need of assistance until a year and a half later. She is not involved in this appeal.

evaluation recommended that the mother attend weekly counseling sessions. And because the mother reported the child was physically aggressive toward her, counseling and behavioral therapy were started for the child.

In April 2020, the department received another report that the father had touched the child "in a sexual manner." When the child was interviewed, she gave inconsistent and non-sensical answers to the questions posed to her. In talking about her father's house, the child volunteered that "no one has touched me or makes me feel unsafe at dad's or mom's house." But then, when the interviewer asked if anyone had ever touched her private areas, the child said, "dad has." When asked to explain, the child's response was "bizarre":

> She stated that she "was playing at dad's house on Tuesday and Dad said clean up, so I went outside cleaning." [The child] went on to state that they all "helped the Earth by cleaning it up." [The child] expressed that her brother "[ ] knocked on my door and asked me to help clean the Earth, Dad was outside cleaning the van." [The interviewer] asked [the child] to help him understand what she meant about her father touching her. [The child] stated that her dad touched her and pointed to her arm pit area on her right arm. [The child] then stated "I'm a princess to them."

Like the others before it, this report was also unfounded.

By June, the juvenile court decided to place the child in the parents' "50/50 shared care" on an alternating-week schedule. The department did not have any concerns about the father's contact with the child, who was observed to be happy in his care. But the mother failed to follow through with getting the child to a family therapy session with the father and lied about her attempts to have the child evaluated at a specialty clinic to assess the child's behaviors. She also failed to start parenting classes or protective daycare for the child, as recommended by the

department. As a result, the court found the change in caretaking responsibilities was appropriate.

Workers monitoring the parents' contact with the child observed "a noticeable change in [her] behaviors between the two homes. While with her father, she presents herself as she should for her age and talks in [an] age appropriate manner and is respectful of her father." But when in her mother's care, the child "talk[s] in baby talk, she waits for her mother to answer questions for her, she 'hangs' on her mother's leg and she is defiant to [her mother's] authority." Once the mother got the child in for her assessment at the specialty clinic, the child's behavior in her mother's care was attributed to anxiety.

Over the summer, the mother re-engaged in therapy that she had been inconsistently attending. Yet her therapist reported, "She continues to lack insight into how her actions are negatively impacting her daughters. She does not seem to understand that this case is a priority and it is important to make her daughters a priority right now. She continues to blame having to work all the time." Because the mother was working so much, the child spent most of her time with her maternal grandmother or aunt during her weeks with the mother. As a result, the court moved the child to the father's home full-time in August, with visits every weekend for the mother. The court warned the mother that it was essential for her to "make adjustments to her parenting. What she is doing right now is insufficient and we need to add in other services. She will need to commit to and follow through with those."

The mother did not take this warning to heart. In October 2020, the child reported that when the mother picks her up from the father's house, she takes her

to a gas station bathroom "and undresses her to 'check for things.'" The mother denied this, but at a doctor's appointment for her older child, she told the doctor that the younger child was being sexually abused by her father because "her vagina is more open than normal." The doctor examined the child but did not note any issues.

These developments prompted the juvenile court to make the mother's visits fully supervised. In doing so, the court found, "It is now very clear what has caused [the child] to make multiple false allegations of sexual abuse in the past. Mother clearly has a number of issues with respect to sexuality that need to be explored." To that end, the court ordered the mother to undergo a psychosexual evaluation.

During that evaluation, which took place over three days, the mother was described as overwhelmed, hostile, evasive, argumentative and defensive, at times yelling and refusing to fill out questionnaires. When asked why she thought the evaluation had been ordered, the mother responded: "All the accusations that have been made. I don't know why about me honestly." This fits with her therapist's observation that she has "very little insight" into the department's involvement and "does not see anything wrong with her actions." During the psychosexual evaluation, the mother described sex as wrong, bad, and dirty and had "extremely limited knowledge of sexual anatomy and physiology." After a series of tests, the mother was diagnosed with post-traumatic stress disorder, sexual aversion disorder, and borderline personality traits. Given the results of the evaluation, it was "*strongly* recommended that . . . [the mother] continue to have supervised visits with her children given [her] continued belief in past allegations."

It was also recommended that she engage in sex therapy and obtain a full neurological evaluation "to help rule out a neurocognitive disorder" given her poor performance on some tests, one of which was so deficient that it revealed a low probability "of her being successful to live on her own, much less supervise minors."

By the permanency hearing in August 2021, the mother was participating in family therapy with the child, along with her own individual therapy, and had remained consistent with her visits. But she had not undergone a neuropsychological examination because she said her primary care doctor told her she didn't need it. And she had been unable to find a sex therapist. So the court granted the mother an extension of time.

Unfortunately, this additional time was not fruitful. Even though she had been given a list of sex therapists who were available for telehealth visits, the mother claimed she was able to reach only one of them, who did not accept her insurance. When the mother's individual therapist offered to discuss sexual issues with her, the mother refused. At the same time, the mother's communication with the department's caseworker decreased and became more hostile. The child was also becoming disconnected from the mother and resistant to visits with her. As one of the workers involved with the mother's case observed, the mother "has made little to no progress throughout the case, and whatever progress she has made seems to be backtracking."

The court directed the State to file a termination petition, which it did in July 2022. A termination hearing was held in October, following which the juvenile court entered an order terminating the mother's parental rights. The mother appeals.

## II.     Analysis

We review termination proceedings de novo. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them"). In performing that review, we apply a three-step analysis that asks whether (1) a statutory ground for termination is satisfied, (2) the child's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See id.*; Iowa Code § 232.116(1)–(3). The mother challenges each of these three steps.

### A.     Ground for termination

For her challenge to the statutory ground for termination, the mother only contests the State's proof of the final element of Iowa Code section 232.116(1)(f)— that the child could not be returned to the parents' custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f)(4); *In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). She points to the child's successful discharge from therapy, her good performance at school, lack of behavioral concerns, and the absence of sexual abuse allegations as evidence the child could be safely returned to her home. *See In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (stating the same element in section 232.116(1)(h) is satisfied only if "the child could not be safely returned" to the parent).

But none of these positive changes were because of anything the mother had done. They all came about only after the child was placed in her father's care and had limited contact with the mother. Indeed, the sexual abuse allegations

stopped only after the mother's contact with the child became fully supervised. Before then, the child was subjected to multiple examinations at a child protection center and by physicians. The allegations continued even after the juvenile court proceedings were initiated, culminating in the mother having the child undress in a gas station bathroom to examine her for signs of abuse and then having a doctor examine her at an appointment for her older daughter.

The social worker for the department testified the repeated sexual abuse allegations and examinations were emotionally harmful to the child. *See, e.g.*, *In re T.D.*, No. 06-0765, 2006 WL 3018131, at *3 (Iowa Ct. App. Oct. 25, 2006) (finding child was harmed by mother photographing child's genitalia to support uncorroborated claims of sexual abuse); *In re B.O.*, Nos. 1999-2649, 9-494, 98-1479, 1999 WL 1020536, at *3 (Iowa Ct. App. Nov. 10, 1999) (finding child was psychologically harmed by "[h]aving to repeatedly explain foundless allegations of abuse to law enforcement"). And she predicted the allegations would continue if the child were returned to the mother's custody. As the department observed in a report to the court, the mother

> has been unable to acknowledge and process whatever issues caused the situation to develop into the present circumstances. She presents [as] being more focused on herself and upset about her perception of being wronged and about all the things that [the children's fathers] have done to her and the girls in the past.

Without that insight, the department did not believe the child could be safely returned to the mother's home. *See In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) ("A parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children.").

The mother alternatively argues that because she has "never shown up unannounced or uninvited to the father's home or the child's school [and] she has never failed to return the child . . . or otherwise demonstrated that she would be unable to abide by expectations regarding visitation," the child "would certainly be safe in the legal custody of the mother and father if she remained in the physical care of the father." Even if section 232.116(1)(f) is concerned with a return to a parent's legal custody but not physical care, a point the mother cites no authority to support, her argument discounts the "severe anxiety" the child experienced from contact with her mother.

The mother has not acknowledged her role in the child's anxiety, or taken any steps to address it, instead projecting blame onto the father and others when confronted. As a result, her contact with the child has only decreased as this case has progressed, moving from unsupervised visits every weekend with frequent phone calls to one supervised visit each week with no phone calls. *See In re M.W.*, 876 N.W.2d 212, 223–24 (Iowa 2016) (finding the failure "to progress to either semi-supervised or unsupervised" visits supported termination). The mother has also failed to do anything to remedy the extreme parenting deficiencies noted in both her psychological and psychosexual evaluations, which led one of the evaluators to strongly recommend supervised contact only. These circumstances show the child remains at risk of harm if the mother's rights are maintained.

For all of these reasons, we find the evidence was sufficient to terminate the mother's parental rights under section 232.116(1)(f).

**B.      Best interests**

The mother next argues termination was not in the child's best interests because of how well the child was doing, again pointing to her successful discharge from therapy.  As we already observed, however, the child was doing well because she was in her father's care.  The social worker described the child now as "a very happy, cheerful, excitable, enjoying-life, little girl.  She just started at a new school system this year.  She's really enjoying school and that type of thing.  She's just happy."  The child's therapist similarly noted: "[She] has become a happy, well-adjusted little girl in [her father's] care.  When asked directly, she states she does not want to live with her mother or visit her."  She was, in fact, fearful of the mother, according to the father, who testified the child had nightmares that the mother would break into his house and take her away.  Workers involved with the case also noted the child's increasing disconnect from her mother, which led to the child refusing to visit her on a couple of occasions.  And one time, after a phone call with the mother, the father took the child to the doctor because of the physical symptoms of anxiety she was experiencing.

In determining whether termination is in the best interests of a child, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child."  Iowa Code § 232.116(2).  The defining elements, however, are the child's safety and need for a permanent home.   *See In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).   All of those considerations lead us to agree with the juvenile court that the child's best interests are best served by termination.

Our conclusion is not changed by the fact that the mother's parental rights to the child's older sibling have not been terminated. That child is now living with the father and the younger child. The father testified that he wants to maintain a relationship between the two girls even if the mother's parental rights to the older child are not terminated. Further, while keeping siblings together is important, it does not outweigh the evidence favoring termination here. *See In re K.A.*, No. 18-0232, 2018 WL 1633524, at *3 (Iowa Ct. App. Apr. 4, 2018).

### C. Statutory Exception

The mother finally argues that because the child was in the custody of her father, the juvenile court should have applied the statutory exception to termination in Iowa Code section 232.116(3)(a). We first note the application of a statutory exception to termination, if one exists, is "permissive, not mandatory." *M.W.*, 876 N.W.2d at 225 (citation omitted). While the child is in her father's legal custody, we agree with the juvenile court the exception should not be applied because of the mother's "debilitating inability to communicate" with the father and the child's "anxiety about contact" with the mother.

### III. Conclusion

Upon our de novo review of the record, we affirm the juvenile court's decision to terminate the mother's parental rights to the child.

**AFFIRMED.**